**CITY OF MIAMI BEACH v. A. M. TENNEY and DEMAREST HOLDING COMPANY, a New York Corporation authorized to do business in the State of Florida.**

7 So. (2nd) 136                                                      En Banc
March 27, 1942                         Rehearing Denied April 15, 1942

242

J. Harvey Robillard and L. A. Schroeder, Jr., for appellant.

J. E. Yonge, Stanley Milledge, and Thomas H. Anderson, for appellees.

BUFORD, J.:

The appeal brings for review orders confirming Master's Report and supplemental report holding special assessments levied for the construction of a street to be invalid and requiring the City to make return to those who had paid special assessments and who filed their claims as required by Order of Court.

There are two questions involved. The first is, whether or not the special assessments were valid; and the second question is, whether or not the suit can be maintained by the named plaintiffs as a class suit for benefit of themselves and all others like situated.

The history of the case is succinctly and clearly stated by the Special Master in his report, which we adopt and quote as follows:

"December 9, 1936, the City of Miami Beach, which will hereafter be referred to as the City, adopted a resolution authorizing the issuance of negotiable bonds, for nine several purposes and in nine several amounts, aggregating Two Million Three Hundred

Thousand Dollars, subject to the 'authorization of the duly registered and qualified voters of said City, who are free-holders therein.' The questions to be submitted were nine in number, and number 4, which involves the property affected by this suit, was as follows:

" 'Shall the City of Miami Beach, Florida, issue negotiable coupon bonds in the amount of Two Hundred Ninety Thousand Dollars ($290,000.00) with interest at a rate hereafter to be determined, not exceeding 4½% per annum, for the Purpose of Paving Portions of Collins Avenue together with necessary protective works, between Twenty-fourth Street and Thirtieth Street and between Forty-fourth Street and the North City Limits of Miami Beach, Florida?'

"On January 11, 1937, City Manager Renshaw addressed a letter to the 'Property Owners of Miami Beach' and certain excerpts are quoted:

" 'An election has been called for January 26, 1937, for the purpose of submitting to the qualified free-holders the question of authorizing the issuance of $2,313,000 in bonds for the purpose of financing improvements which are immediately necessary. Without them, further progress and development will be greatly retarded. A report which was recently submitted to the City Council is attached giving an outline of the proposed projects. . . .' "

" 'This report is being mailed to all property owners regardless of whether or not they can qualify for the election in order that all may be advised concerning the proposed improvements.'

"And from the report, dated November 17, 1936, which is attached to that letter, I quote:

'Paving

" 'There are many streets in the City which require paving to provide for increased traffic. Most of these projects, however, are comparatively small and can be financed from time to time from current funds. One of the projects most urgently needed and one which will be too costly to finance from current funds, is the widening of certain sections of Collins Avenue and the paving from curb to curb of that portion lying between Forty-fourth Street and the north city limits. This street in its present condition is wholly inadequate to handle traffic. While it is true that the highway has been designated as a part of the State Highway System and might ultimately be paved by the State Road Department, all indications are that the execution of work is so far in the future that it would be extremely detrimental to the City to permit it to remain in its present condition until such time as the State Road Department might see fit to take it over.'

" 'I recommend that an election be called for the purpose of submitting to the qualified electors who are freeholders, the question of the issuance of bonds for the above projects. . . . Detailed estimates of all of these projects as well as Mr. Pirnie's preliminary report, are available in the files of the Engineering Department.'

"January 26, 1937, the election was held; returns canvassed Januray 29, 1937, showing that the issuance of said bonds had been approved by a majority of the votes cast in the election. February 5, 1937, resolution was passed authorizing the issuance of the bonds, in form, amounts, dates, maturities, and numbers as therein set forth; the entire issue to be entitled

Public Improvement Bonds: the bonds as to the improvement under discussion being further described as 'Collins Avenue Paving Bonds.' The bond recites 'issued by said City for the purpose of paying the cost of certain public improvements in the City,' and 'under the authority of and in full compliance with the Constitution and statutes of the State of Florida, including Chapter 14715, General Laws of Florida, 1931, and the City Charter, being Chapter 7672 of the Laws of Florida, 1917, and acts amendatory thereof and supplemental thereto, and has been duly authorized and approved by a majority of the votes cast in an election in which a majority of the free-holders who are qualified electors residing in said City participated,' and further 'that provision has been made for the levy and collection of a direct annual tax upon all taxable property within said City sufficient to pay the interest and principal of this bond as the same shall become due, and that the *total indebtedness of said City* including this bond, does not exceed any Constitutional or statutory limitation thereof,' and further, the ordinance provided:

" 'Section 4. That in each year while any of said bonds shall be outstanding, there shall be levied on all of the taxable property within said City, a direct annual tax sufficient to pay the principal and interest falling due in the following year upon said bonds, which tax shall be collected as other City taxes and shall be used for no other purpose than the payment of said principal and interest.'

"The bonds were issued, dated April 1, 1937, and validated and confirmed by decree of Circuit Court, and funds were received May 24, 1937, from the sale of said bonds.

"On March 17, 1937, by resolution No. 3899, the City ordered the construction of the following described improvement, to be designated in all proceedings as Highway Improvement H-166, setting forth its intention to proceed under Sections 29 and 30:

" 'Forty-Fourth Street: From the East line of Collins Avenue to the east line of Indian Creek Drive, and Collins Avenue; from the south line of Forty-fourth Street to the north line of Eighty-seventh Terrace, to be paved, *and where heretofore paved, to be re-paved,* to a width of forty-nine feet with a bituminous wearing surface on a ten (10) inch rock base, together with necessary drainage, sewer inlets, manholes and catch basins, and improved on both sides with a concrete curb and gutter.'

"And in the said resolution the Engineer was directed to file plans, specifications, estimate of costs as set forth in the resolution and *'the estimated amount to be assessed against each front foot of abutting property.'*

"On the same day, to-wit, March 17, 1937, City Engineer complied with the directions of said resolution No. 3899, by filing plans, estimate etc.; and again on the same day, March 17, 1937, resolution 3902 was passed directing the City Clerk to give notice that at a meeting to be held on March 17, 1937, the City Council would hear the *'objections of all persons interested to the confirmation of said resolution ordering said improvement.'*

"Total estimated cost and incidental expense for the work (which was a part only of Collins Avenue Paving Project), was set by the Engineer at $193,145.70; front foot assessment at $4,574.

"On March 31, 1937, Resolution No. 3924, passed,

reciting publication of notice and to 'receive and hear objections of all persons interested to the confirmation of said resolution ordering said improvement, and no objections having been presented at the time and place aforesaid, Therefore, be it resolved by the City Council of the City of Miami Beach, that the said resolution of said City Council ordering said Highway Improvement H-166, District H-166, be and the same is hereby confirmed; and an appropriation of $193,145.70 is hereby authorized to be set up from Current Fund, the City Council hereby declaring its intention to proceed by letting a contract. Appropriation of $50,300 from Current Fund is hereby authorized for water extensions required in advance of this improvement.'

"On January 19, 1938, City Engineer filed his report showing work started May 14, 1937; work completed December 21, 1937; net cost of improvement $202,236.35, divided:

Total Frontage Assessment:
   32,929,898' at $4,7861145—$157,606.25.

City's Share:
   Street Frontage     2098.10'
   Outlot Frontage    6208.81'
   Govt. Frontage     1018.00'
                              9324.91' at 4.7861145—$44,630.09.

"The Engineer's Certificate, under date of January 19, 1938, was as follows:

'I, the undersigned, City Engineer of Miami Beach, Florida, do hereby certify that the following is a true and correct statement of the cost of the work of Highway Improvement H-166, District H-166, and is composed of the actual cost of the work and the esti-

mated cost of the incidental expenses thereof, with a description of lots or parcels of land liable to liens therefor; the foot frontage assessments, the total assessment chargeable against each lot or parcels, *computed according to frontage, And In Proportion To Special Benefits Received, and not in excess of such benefits;* and a statement of all other things required by the Assessment Roll in accordance with Sections 29 and 30 of the City Charter of said City.'

"On January 19, 1938, by Resolution No. 4213, City found Highway Improvement was completed and acceptance of said improvement recommended by the City Manager and City Engineer, and directed the Clerk to give notice that on February 2, 1938, City Council would 'hear any objections of persons interested in or affected by the said improvements as to the acceptance thereof by the City Council.'

"On February 2, 1938, Resolution No. 4225 was passed, reciting that 'no written objections were filed to the confirmation of said preliminary assessment roll,' and confirming the preliminary assessment roll, except as to certain lots and tracts against which the assessment was reduced, 'it being hereby decided that the special benefits to said lots, on account of the reasons given, are those benefits as stated below, after such reduction and modifications.' (Here follows descriptions of a few tracts and lots, in which the frontage was reduced), and then the resolution continued:

" 'Be it further resolved that the sums and amounts assessed against each of the lots or parcels of ground described in said preliminary assessment roll, and the sums and amounts against each of the lots or parcels of ground therein set forth, *are less than the amounts*

*each lot or parcel of ground is benefited by said* im-
·provement, and that the total assessments as indicated
. . . are hereby approved and confirmed.'

"Concerning bond issues, the Chapter in 1931, by
Chapter 15346, was amended to read:

"Provided, however, that no bonds of the City of
Miami Beach shall be issued or sold by said City when
the total bonded indebtedness shall exceed fifteen per
cent (15%) of the total assessed value of all real and
personal property within its corporate limits.

"Provided, also, that no bonds shall be issued under
Section 37 of this enactment until after the same
shall have been approved by a majority of the votes
cast in an election in which a majority of the free-
holders, who are qualified electors residing in the said
City of Miami Beach shall participate in conformity
with the provisions of Section 6 of Article 9 of the
Constitution of the State of Florida; and all such
bonds shall be otherwise issued pursuant to the pro-
visions of Sections 29 and 30 of this enactment, and
the same shall be paid by the levy and assessment of
taxes as is provided for the payment of bonds referred
to in said Section 29 and 30 of this enactment. Pro-
vided, however, that the proceeds of such bonds and
taxes shall be placed in such accounts or funds as
said City Council shall see fit."

"In 1927, Section 29 and 30 (aa) relating to local
improvements read:

" 'It shall not be necessary to submit to the voters
the proposition of issuing any bonds or making any
such improvements or special assessments or any
other matter or thing herein authorized, *and the
initiative and referendum provisions of this* Charter
shall not be applicable thereto,' but was amended in

1931, Chapter 15346, so as to make it compulsory for
the City to refer all bond issue questions to the free-
holders for approval.

"Concerning the Charter provisions as to Assess-
ment of Individual Lots, Section 29 and 30 (k) 4 (p)
reads:

" 'The amount of the cost of water front and board
or other walks, improvements and storm sewers, in-
cluding laterals so apportioned to lots and parcels
of land, shall be assessed to the several lots and
parcels within the district, In the Proportion Which
the City Engineer Deems to be the Proportion of
Special Benefits Each Such Lot or Parcel Shall
Receive, and the amount of cost of each highway,
sidewalk and sanitary sewer improvement , except
laterals so apportioned to abutting property, Shall Be
Assessed In said roll against such abutting property,
According to Frontage.'

"Section 29-30 (k) 4 (b) reads:

" 'To the City shall be apportioned the cost of high-
way improvements at the intersections.'

"(c)  'To abutting property shall be apportioned
the remaining cost of highway improvements.'

"An important section of 29-30 is (k) I, reading:

" 'After a contract shall have been entered into for
any improvements embraced in any resolution . . .
the City Engineer shall prepare a preliminary assess-
ment roll and file same with the City Clerk, which
roll shall contain the following:

" '1.  a description of the lots and parcels of land
within the district, which in the case of improvements
the cost of which or part thereof is to be *assessed
against an area deemed specially benefited thereby*
shall include all property declared by the City Council

in such improvement resolution to be specially bene-
fited thereby, and in case of *other improvements,*
shall include lots and lands which abut upon the sides
of that part of any highway to be improved. . . .
There shall also be given the name of the owner of
each lot or parcel where such can be ascertained
from the City Records, and in all cases, Save Areas
To Be Assessed For The Cost Or Part Thereof And
Deemed To Be Especially Benefitted, a statement of
the number of feet of property so abutting which
number of feet shall be known as the frontage.'

"And Section 29-30 (e) relating to filing of plans
and estimate of cost by City Engineer has this pro-
vision: 'and except in case of improvements the cost
of which, or part thereof, is to be assessed against an
area deemed especially benefited thereby, the esti-
mated amount to be assessed against each front foot
of abutting property.'

"And Section 29-30 (s) reads:

" 'At the time and place stated in such notice, the
City Council shall hear and receive the objections in
writing of all interested persons interested in said
notice.   Then or thereafter the City Council shall
either annul or sustain or modify in whole or in part,
the prima facie assessment as indicated on said roll,
either by confirming the prima facie assessment
against any or all lots or parcels therein described, or
by cancelling, increasing or reducing the same, ac-
cording to the special benefits which said City Council
decide each said lot or parcel has received or will
receive on account of such improvement.   If any
property which may be chargeable under this Section
shall have been omitted from said preliminary roll,
or if the prima facie assessment has not been made

against it, the City Council may place on said roll an apportionment to said property. The City Council may thereupon confirm said roll *but shall not confirm any assessment in excess of the special benefits to the property assessed, and assessments so confirmed shall be in proportion to the Special benefits.* Forthwith after such confirmation said assessment roll shall be delivered to the City Clerk and such confirmation shall be final and conclusive, except as hereinafter provided.' "

So it is seen that the City adopted a method provided by the Charter for raising funds for public improvements, including the Collins Avenue paving project, and that the bonds contemplated under this procedure had been authorized and approved by freeholders' election and validated by court. The City Council then determined to proceed to levy special assessments to reimburse itself for the exenditures required for the Collins Avenue paving and particularly proceeded under the provisions of Sections 29 and 30 of Chapter 15346, Acts of 1931, being an amendment to Chapter 13101, Special Acts of 1927, and which latter Act was amendatory of Chapter 7672, Acts of 1917.

The municipality, however, did not abandon its procedure initiated to issue general municipal bonds for the purpose of raising funds with which to make the involved improvement, but proceeded to issue and sell the bonds to pay for the improvement thereunder. Neither did the municipality proceed under the provisions of Chapter 15346, Acts of 1931, amending sub-section "aa" of Sections 29 and 30 of the former Acts which provided as hereinbefore quoted.

Neither were the special assessments made until

after the work had been completed and paid for with the proceeds of the bond issue which had been issued as a general obligation of the municipality. The only bonds which had been authorized or approved for the payment of this improvement were bonds constituting the general obligation of the City and in nowise pledging special assessments for the payment of the same.

The appellant insists that our opinions in the cases of Stockman v. City of Trenton, 132 Fla. 406, 181 Sou. 383; DeLand v. Boyd, 109 Fla. 328, 147 So. 575, and Abel v. Boynton, 95 Fla. 984, 117 Sou. 507; Escott v. City of Miami, 107 Fla. 273, 144 Sou. 397, are controlling of the questions here involved and upon authority of these opinions the orders appealed from should be reversed.

With this conclusion we cannot agree. The case of Stockman v. City of Trenton, supra, is not in point and in the other cases the controlling question here presented was not presented. Our conclusion is that this case is ruled by our opinion and judgment in the case of City of St. Cloud, et al., v. Carlson, et al., 78 Fla. 131, 82 Sou. 616.

The factual difference between that case and the one now before us is that there the City Council had provided sufficient funds by the issue and sale of bonds to pay for the street improvements designated in the ordinance and had proceeded to construct and pay for the work with the proceeds of the bond issue before it attempted to levy the special assessments. While here, the municipality had proceeded with the bond issue up to the point of holding the election and authorizing the issuance of the bonds, which authorization is evidenced by resolution under date of

February 5, 1937, pursuant to the result of the election held on January 26, 1937, and thereafter, on March 17, 1937, the resolution No. 3899 was adopted whereby it was proposed to proceed with the improvement under the provisions of Sections 29 and 30 of the Charter as amended, supra.

If the City had at that time, to-wit: March 17, 1937, abandoned its plan of financing this particular improvement and proceeded under the new plan initiated by Resolution No. 3899, supra, an entirely different question would be presented, but this was not done. The City proceeded to sell the bonds and to make the improvements with the proceeds of that bond issue, and then proceeded to levy the special assessments to produce funds with which to pay the expenses of the construction which had already then been done, performed and paid for as stated above.

So, in principle there is no difference between the legal questions presented here and those presented in the case of City of St. Cloud, et al., v. Carlson, et al., supra.

The City having adopted a definite method for producing the funds with which to pay for the paving of Collins Avenue here involved by floating a bond issue, the general obligation of the City, it was then without power to provide for the paying off of that bond issue by the levy of special assessments.

The next question, as to whether or not this suit may be maintained by plaintiffs as a class suit, we think, must also be resolved against the contention of the appellants. It is true that we have not had a case directly involving the factual conditions existing here.

It appears to us that the question of whether or

not the suit was properly brought as a class suit fades out of the picture because the court in its order approving the Master's original report required notice to all claimants to file claims within a stated period and numerous claimants complied with that order and filed their claims thereby intervening in the suit and the order confirming the Master's supplemental report allows the claims of those who thus filed and proved their claims. But, aside from this, the present suit in effect is a taxpayers' suit. The plaintiffs and all those like situated acquired their status through the one act of the municipality, that is, the attempted levy of special assessments. However, this case differs from the case of DeLand v. Boyd. In that case the effort was to set aside the general ad valorem tax roll and the plaintiff sought to represent the public. Here the class is certain and restricted. The action of the City in attempting to levy the Special assessment against certain property owners resulted in bringing those certain property owners into a stated class and here the suit is to enjoin collection of such special assessments which have not been collected and to require the return of the money which has been collected for a tax not lawfully imposed.

Section 14 of 1931 Chancery Practice Act provides:

"Section 14. Class suits; Effect of.—When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

Here the question, or subject matter, is one of common interest to all the property owners against whom the special assessment was attempted to be levied.

In a well reasoned opinion in the case of Commonwealth to the use of Wiggins, et al., v. Scott, et al., 112 Ky 252, 65 S.W. 596, the court, inter alia, said:

"The jurisdiction has been exercised in a great variety of cases where the individual claimants were completely separate and distinct, and the only community of interest among them was in the question at issue, and perhaps in the kind of relief; and, the single decree has, without any difficulty, settled the entire controversy, and determined the separate rights and obligations of each individual claimant. The same principle therefore embraces both the technical 'bills of peace' in which there is confessedly a common right or title or community of interest in the subject matter, and also those analogous cases over which the jurisdiction has been extended, in which there is no such common right or title or community of interest in the subject matter, but only a community of interest in the question involved and in the kind of relief obtained. And in Sec. 270 he says: 'Wherever, on the other hand the taxpayers of a district subject to an unlawful burden are regarded as having some cause of action, as entitled to some judicial remedy,— as, for example, where the individual taxpayer may maintain an action at law to recover back the illegal tax which he has paid or to recover damages,— there, in my opinion, all the reasons for exercising the jurisdiction to prevent a multiplicity of suits in any case of the third or fourth classes apply with great and convincing force in support of the same jurisdiction in behalf of such taxpayers.'

"Judge Cooley in his work on Taxation (page 769) says: 'When the supposed illegality in a tax proceeding affects a single person only, or affects him in a

peculiar manner, distinguishing his case from that of others, he cannot unite with others in a suit to restrain such proceeding. A joint bill by two or more parties setting out distinct grounds on which each sought relief would be dismissed as multifarious. But where the illegality extends to the whole assessment, or where it affects in the same manner a number of persons, so that the question involved can be presented without confusion by one bill filed by all or any number of those thus affected, there seems to be no sufficient reason why a joint bill should not be permitted. The reasons favoring it are that it avoids the necessity of a multiplicity of suits, and the attendant trouble and expense; and the objection that the interests of complainants are several is sufficiently met by the fact that complete justice may be done to all in one suit on the single issue, whereas, if the parties did not join, the same issue must be passed upon in separate suits bought by the several complainants. Although there has been some hesitation in sanctioning such bills, the weight of authority is decidedly in favor of supporting them, and this method of redress is now most commonly resorted to where the case is appropriate for it.'

"As supporting those texts, we find the opinions of the courts of last resort of at least 22 states of the Union, with practically none opposed; also many federal courts upholding it. Section 25 of Civil Code Practice of this state, which is substantially a re-enactment of Section 37 of the former Code, recognizes and codifies this equitable practice. It is: 'If the question involve a common or general interest of many persons, or if the parties be numerous and it is impracticable to bring all of them before the court

within a reasonable time, one or more may sue or defend for the benefit of all.' "

There is no effort apparent from the face of the record to bind anyone who has not appeared in the suit.

The question presented here is not whether or not the City of Miami Beach had the power under its charter to levy special assessments; nor is it whether or not sufficient notice was given in regard to the levy of such special assessments, but the question here is, whether or not the power remained in the City to levy those particluar special assessments were attempted to be levied and had not only pursued that other course to provide the funds but in fact had so provided the funds and with them had paid for the improvements.

No reversible error appearing from the face of the record here, the orders and decrees appealed from should be and are affirmed.

So ordered.

BROWN, C. J., WHITFIELD, TERRELL, and CHAPMAN, JJ., concur.